**UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF KENTUCKY
London Division**

| | |
|---|---|
| NFINITYLINK COMMUNICATIONS, INC.<br><br>    Plaintiff,<br><br>              v.<br><br>THE CITY OF MONTICELLO,<br>KENTUCKY; THE CITY COUNCIL OF<br>THE CITY OF MONTICELLO;<br>COMMUNITY TELECOM SERVICES<br><br>    Defendants. | Case No.: _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

For its Complaint against Defendants the City of Monticello, Kentucky, the City Council of the City of Monticello, Kentucky (together the "City"), and Community Telecom Services ("CTS"), Plaintiff NfinityLink Communications, Inc. (d/b/a InfinityLink Communications) ("InfinityLink"), by its undersigned counsel, alleges, upon knowledge as to its own actions and upon information and belief as to all other matters as follows:

**NATURE OF THE ACTION**

Residents of the City of Monticello currently only have one choice of providers for cable and Internet service, and Internet connectivity is not universally available in the City. Together, Wayne County, Kentucky, and the City own the existing incumbent provider, CTS. InfinityLink wants to offer the residents of the City a choice of providers and expand the availability of advanced communications services in the City. Before it can do that, InfinityLink needs authority from the City to build a network in the City rights of way. However, at CTS's urging,

the City Council has refused InfinityLink's request for a franchise to access the rights of way in the City. The City has offered no reasonable justification for its refusal other than its own commercially motivated self-interest in shielding the City-owned incumbent cable operator (CTS) from competition. The City's refusal to allow InfinityLink to bring competition to Monticello, based in part on CTS's anticompetitive influence, amounts to a violation of 47 U.S.C. § 541(a)(1), 47 U.S.C. § 253, 15 U.S.C. §§ 1 and 2, and Kentucky Revised Statutes § 367.175(1) and (2).

## PARTIES

1.    Plaintiff InfinityLink is a North Carolina corporation with its principal place of business at 1106 A Kingold Blvd., Snow Hill, North Carolina 28580 and authorized to transact business in the Commonwealth of Kentucky. InfinityLink constructs, owns, operates, and manages communications networks that provide cable, voice, and broadband services to residential and commercial customers. InfinityLink also provides consulting services to assist other network owners with the operation and management of their communications networks.

2.    Defendant City of Monticello is a duly authorized municipality constituted and existing under the laws of the Commonwealth of Kentucky.

3.    Defendant City Council of the City of Monticello is the governing body that exercises the authority of the City of Monticello.

4.    Defendant Community Telecom Services ("CTS") is a cable operator authorized by the City to construct a cable system in the City rights of way and providing voice, cable, and Internet services to the residents of the City. CTS is jointly owned by the City and Wayne County, Kentucky.

2

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331 because of the existence of a federal question arising under the Communications Act of
1934, as amended, (the "Communications Act").  This Court has authority to issue declaratory
judgment relief pursuant to 28 U.S.C. § 2201(a).

6.      The Court has jurisdiction over InfinityLink's claims arising under 47 U.S.C. §§
253, 541, and 555 and 15 U.S.C. §§ 1, 2, 15, and 26.

7.      The Court has supplemental jurisdiction over InfinityLink's state law claims
under K.R.S. 367.175(1) and (2), pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. §
90(a)(2) in that Defendants reside in this judicial district and the events or omissions giving rise
to this action occurred in this District.

## FEDERAL COMMUNICATIONS LAW

9.      The Communications Act regulates communications services in the United States,
and is, in part, designed to promote and increase the deployment of competitive communications
networks.

10.     Indeed, in the 1990s, Congress enacted two major amendments to the
Communications Act to promote competition in the communications industry.  First, Congress
passed the Cable Television Consumer Protection and Competition Act of 1992, which amended
Title VI of the Communications Act (the "Cable Act"), to provide increased consumer protection
and to promote competition in the cable television market.  Next, Congress enacted the

Telecommunications Act of 1996 (the "1996 Act"), which was intended to increase and improve competition in the telecommunications industry.

11.     The Cable Act, as amended, establishes a uniform regulatory framework governing the rights and responsibilities of cable operators that provide cable service and the entities that regulate those providers, including State and local governments, and the Federal Communications Commission ("FCC").

12.     The Cable Act was enacted to "establish a national policy concerning cable communications" and "establish franchise procedures and standards which encourage the growth and development" of cable systems, and which establish guidelines under which local governments would operate within uniform federal standards.  47 U.S.C. §§ 521(1), (2), (3). These statutes ensure that cable services are available to the public, encourage diverse services, protect against unfair franchise denials, and promote competition in cable communications.  *Id*. at (4), (5), (6).

13.     While the Cable Act recognizes the power of local franchising authorities to issue cable franchises, as the 1992 amendments to the Cable Act make clear, "a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise."  47 U.S.C. § 541(a)(1).

14.     Moreover, "[a]ny applicant whose application for a second franchise has been denied by a final decision of the franchising authority may appeal such final decision pursuant to the provisions of Section 555 of this title for failure to comply with this subsection."  *Id*.

15.     The Cable Act makes clear that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise

4

granted by such authority, which is inconsistent with this Act shall be deemed to be preempted and superseded."  47 U.S.C. § 556(c).

16.     The 1996 Act was expansive legislation intended to increase and improve competition in the telecommunications industry.  An important purpose of the 1996 Act was to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . ."  H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 1 (1996).

17.     When it enacted the 1996 Act, Congress considered the potential conflict between state and local government regulation of the public ROW, and the national need for deployment of advanced telecommunications and information technologies.  Accordingly, the 1996 Act created Section 253 of the Communications Act, which prohibits local entities from erecting legal requirements that prohibit or have the effect of prohibiting the ability of any entity to provide any telecommunications services, including taking actions or inactions that result in an unreasonable delay in the deployment of the provider's facilities and provision of service.  47 U.S.C. § 253(a).

18.     While the 1996 Act did recognize the pre-existing authority of local governments in managing the public rights-of-way, it limited that authority by requiring that any State or local right-of-way management be "competitively neutral and non-discriminatory."  47 U.S.C. §253(c).

19.     As the Federal Communications Commission recently confirmed a local action unlawfully prohibits the provision of service in excess of the reserved Section 253(c) authority if the action "materially inhibits or limits the ability of any competitor *or potential competitor* to compete in a fair and balanced legal and regulatory environment."  *In the Matter of Acceleration*

*of Broadband Deployment by Removing Barriers to Infrastructure Investment*, Declaratory

Ruling and Third Report and Order, 33 FCC Rcd 9088, ¶ 35 (Sept. 27, 2018)

## ANTI-TRUST LAWS

20.     Federal anti-trust law states that "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.

21.     Federal anti-trust law also makes illegal conspiracies to "monopolize any part of

the trade or commerce among the several States."  15 U.S.C. § 2.

22.     Federal law further authorizes that "any person who shall be injured in his

business or property by reason of anything forbidden in the antitrust laws may sue therefore in

any district court of the United States in the district in which the defendant resides or is found or

has an agent, without respect to the amount in controversy, and shall recover threefold the

damages by him sustained, and the cost of suit, including reasonable attorney's fee."  15 U.S.C. §

15(a).

23.     Injunctive relief is also available to parties "against threatened loss or damage by

a violation of the antitrust laws."  15 U.S.C. § 26.

24.     Similarly, Kentucky law states that "[e]very contract, combination in the form of

trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall

be unlawful." K.R.S. 367.175(1).

25.     Kentucky law also provides that "[i]t shall be unlawful for any person or persons

to monopolize, or attempt to monopolize or combine or conspire with any other person or

persons to monopolize any part of the trade or commerce in this Commonwealth." K.R.S.

367.175(2).

## FACTUAL BACKGROUND

26.     InfinityLink constructs communications networks capable of providing cable service, telecommunications service, and information service.

27.     InfinityLink has operated cable systems in multiple jurisdictions in North Carolina for 6 years.  InfinityLink uses those cable systems to provide a variety of services to its customers, including video, voice, and broadband Internet services to residential and business customers, including cable service, telecommunications service, and information service as those terms are defined in Federal law.

28.     Community Telecom Systems ("CTS") is currently the only cable operator serving the City.

29.     Upon information and belief, CTS is jointly owned by the City and Wayne County, Kentucky, with each jurisdiction owning a 50% stake in the cable operator.

30.     Beginning in approximately 2017, CTS engaged InfinityLink as a consultant to assist with operations of CTS's cable system.

31.     InfinityLink's work for CTS involved strategic consulting as well as significant operational direction, including purchasing and utilizing InfinityLink's own hardware and equipment to optimize performance of CTS's cable system.

32.     CTS knew that InfinityLink had purchased and installed equipment owned by InfinityLink in the CTS headend that was critical to optimal operation of the CTS cable system.

33.     During the time in which InfinityLink was working with CTS, CTS's revenues and subscriber base grew substantially.

34.     From 2014 to 2020, including the time in which InfinityLink worked with CTS, CTS employed a Manager named Dale Hancock.  During that time, Mr. Hancock had primary responsibility for CTS's system operations.

35.     At its May 20, 2020 meeting, the CTS Board of Directors voted to hire a new co-manager that would share responsibilities with Mr. Hancock, and specifically replace the functions and services that InfinityLink was providing to CTS.  Shortly thereafter, Mr. Hancock resigned from his position with CTS.

36.     On May 21, 2020 InfinityLink submitted a letter to the City addressed to Mayor Tracie Sexton formally requesting a cable television franchise pursuant to Section 621(a)(1) of the Communications Act (47 U.S.C. § 541(a)(1)).

37.     The CTS Board of Directors held a special meeting on May 28, 2020.  At that meeting, the CTS Board voted to formally terminate its consulting relationship with InfinityLink.

38.     InfinityLink was present at the May 28, 2020 meeting.

39.     At the May 28, 2020 meeting, InfinityLink asked the Board when the termination of CTS's relationship with InfinityLink would be effective.

40.     The CTS Board responded that the termination of the relationship with InfinityLink was effective immediately.

41.     After hearing this response, and still at the May 28, 2020 meeting, InfinityLink requested that CTS return the three pieces of equipment (two Dell PowerEdge Servers and one Cisco 2RU Office Router, hereafter the "Equipment") that InfinityLink had purchased and installed in CTS's headend pursuant to its work assisting CTS with the operation of the CTS cable system.

42.     CTS indicated that it would return the Equipment to InfinityLink on June 1, 2020 (the following week).

43.     After the May 28, 2020 meeting, at which CTS stated that the termination of its relationship with InfinityLink was to take effect immediately, and that it would return the Equipment the following week, InfinityLink remotely powered down the Equipment.

44.     To date, CTS has not returned the Equipment to InfinityLink.

45.     On July 27, 2020, InfinityLink, without prompting from the City, submitted a follow-up letter to the City providing additional details regarding InfinityLink's request for a cable television franchise, with the express goal of accelerating the City's process of considering whether to grant InfinityLink's request for a competitive franchise.

46.     InfinityLink's July 27th letter included, among other things, offers: to pay the City a franchise fee of 5% consistent with federal law (47 U.S.C. § 542); to carry 3 channels for Public, Educational, and Governmental ("PEG") programming; and monetary support for the City's PEG capital needs in the amount of $15,000.

47.     At its regular meeting on August 10, 2020, the City Council considered as an agenda item InfinityLink's request for a competitive cable television franchise.

48.     At the August 10, 2020 meeting, shortly before the City Council considered InfinityLink's request for a competitive cable television franchise, the City Council voted to approve an agreement between CTS and the City to allow CTS to install wireless antennas on a City owned water-tower to enable the provision of wireless internet service to locations that CTS cannot reach with fiber.

49.     During the time dedicated to considering InfinityLink's request, the City Council heard a presentation from the City Clerk, Mr. Greg Latham.

50.     Upon information and belief, in addition to being the City Clerk, Mr. Latham serves on the Board of CTS, and at the time of his presentation to the City on August 10, 2020 he was the Chairman of the Board of CTS.

51.     Mr. Latham's presentation to the City Council at the August 10, 2020 meeting discussed efforts CTS had implemented and discussed InfinityLink's prior work with and interactions with CTS.

52.     Mr. Latham explained that they did not want InfinityLink to compete with CTS and requested that the City Council reject InfinityLink's request and refuse to grant a competitive cable television franchise.

53.     Mr. Latham's presentation to the City Council at the August 10, 2020 meeting did not discuss InfinityLink's technical qualifications to construct and operate a cable system in the City.

54.     Mr. Latham's presentation to the City Council at the August 10, 2020 meeting did not discuss InfinityLink's financial qualifications to construct and operate a cable system in the City.

55.     Mr. Latham's presentation to the City Council at the August 10, 2020 meeting did not discuss InfinityLink's legal qualifications to construct and operate a cable system in the City.

56.     Upon information and belief, Mr. Latham's presentation to the City Council at the August 10, 2020 meeting represented the views and interests of CTS, in his role as Chairman of the Board of CTS.

57.     Upon information and belief, Mr. Latham's presentation to the City Council at the August 10, 2020 meeting was not a competitively neutral evaluation of InfinityLink's franchise request made in his role as the City Clerk.

58.     After Mr. Latham's presentation, the item was put to the City Council for discussion.

59.     At the beginning of its discussion, the Council focused on the condition of CTS's services and CTS's ability to provide service.

60.     Individual Council members directed questions toward Mr. Latham about the status of CTS and its capabilities.

61.     In response to a comment from one council member, Mr. Latham stated that InfinityLink was "coming after our customers," and trying to "mak[e] a presence here to interrupt the taxpayer money from the City and County to hurt our cable system."

62.     In its discussion, the City Council explained that the franchise requested would grant InfinityLink the right to use the City rights-of-way and compete with CTS.

63.     Although it asked about CTS's technical capabilities to continue operating without the assistance of InfinityLink, the City Council did not discuss or inquire about InfinityLink's technical capability to operate a cable system in the City.

64.     The City Council did not discuss or inquire about InfinityLink's financial capability to operate a cable system in the City.

65.     The City Council did not hear or invite comment from InfinityLink or a representative thereof before voting on InfinityLink's request.

66.     Having only heard from the Chairman of the Board for the incumbent cable operator (CTS), and having failed to discuss or inquire about InfinityLink's qualifications or ability to provide service to offer consumers in the City a choice of cable and internet providers, the City Council voted to deny InfinityLink's franchise request.

67.     The City Council did not articulate any reason for its denial of InfinityLink's request for a competitive cable television franchise.

68.     Based on the presentation and discussion when the City Council considered the request, the only justification for the denial is that the City did not want a new provider to compete with the City and County owned incumbent provider, regardless of the obvious benefits competition brings to the citizen consumers in the City.

69.     At the end of the August 10, 2020 City Council meeting, during a time for public comment and after the City had already voted to deny InfinityLink's request, Mr. Hancock stepped forward to comment on his experience at CTS, and respond to allegations against InfinityLink.

70.     Less than two minutes into Mr. Hancock's comments, and while he was speaking, the City Council abruptly moved to adjourn the meeting.

71.     After having its request for a competitive cable television franchise denied, on August 11, 2020 InfinityLink asked the City Clerk, Mr. Latham, what would be required for InfinityLink to obtain a license to occupy the City rights of way to provide only non-cable services to customers, including telecommunications services and information services (primarily voice and Internet services).

72.     Mr. Latham responded that the City would not issue InfinityLink a license to occupy the rights of way without a cable franchise, even if InfinityLink only intended to provide non-cable services.

73.     By letter dated August 13, 2020, InfinityLink requested that the City reconsider both the denial of its request for a competitive franchise and the denial of its request for a license to use the City's rights of way to provide other non-cable communications services.

74.     The City did not respond to InfinityLink's August 13, 2020 letter.

75.     On September 10, 2020, InfinityLink sent correspondence to the City requesting to be heard on the franchise request at the next City Council meeting, which was to occur on September 14, 2020.

76.     On September 11, 2020, the City Attorney responded to InfinityLink, denying the request to address the City Council at the September 14, 2020 meeting.

77.     The City Attorney's September 11, 2020 response stated, "[a]t the last meeting of the Council a representative of your company appeared and became confrontational."

78.     Upon information and belief, InfinityLink understood the City Attorney to be referring to the August 10, 2020 meeting and Mr. Hancock's public comments made, and abruptly interrupted, at the end of that meeting.

79.     Mr. Hancock is not a representative of InfinityLink and was not representing InfinityLink at the August 10, 2020 meeting.

80.     Ultimately, InfinityLink was not afforded an opportunity to address the City Council at the public meeting to present its qualifications to operate a cable system and provide additional telecommunications and information services (e.g. voice and broadband Internet) in the City.

81.     The City has offered no reason for its denial of InfinityLink's request for a competitive cable television franchise.

82.     The only reason the City has offered for denying InfinityLink access to the rights of way to provide non-cable, voice, Internet, and telecommunications services is that InfinityLink does not have a cable franchise.

83.     The only rationale that can be inferred from the City's denial of InfinityLink's attempts to construct a communications network in the City to offer residents of the City a choice of phone, Internet, and cable providers is an anticompetitive desire to protect the incumbent provider, CTS, in which the City is a part owner.

84.     The City's denial of InfinityLink's request to provide service in the City blurs the City's regulatory role as manager of the public rights of way, and its proprietary role as an owner of the incumbent cable, phone, and Internet Provider.

85.     The City has used its regulatory power to prohibit market entry of a competitive service provider in favor of its proprietary interest in the incumbent service provider.

86.     This case is timely filed pursuant to 47 U.S.C. §555 because it is filed within 120 days from August 10, 2020, which was the date InfinityLink received notice of the City's denial of its franchise application.

## COUNT I

## VIOLATION OF THE CABLE ACT

### (47 U.S.C. § 541(a)(1))

87.     InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 86.

88.     47 U.S.C. § 541(a)(1) states: "A franchising authority may award, in accordance with the provisions of this title [47 U.S.C. §§ 521 *et seq.*], 1 or more franchises within its jurisdiction; except that a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise.  Any applicant whose application for a second franchise has been denied by a final decision of the franchising authority

14

may appeal such final decision pursuant to the provisions of section 635 [47 U.S.C. § 555] for failure to comply with this subsection.

89.     InfinityLink requested a competitive franchise from the City to provide cable, voice, and Internet service in competition with the incumbent cable operator CTS.

90.     On August 10, 2020, by vote of the City Council, the City denied InfinityLink's request for a competitive cable franchise.

91.     Before it voted to deny InfinityLink a cable franchise, the City Council did not hear testimony from InfinityLink.

92.     Before it voted to deny InfinityLink a cable franchise, the City Council did not consider InfinityLink's qualifications to operate a cable system.

93.     Before it voted to deny InfinityLink a cable franchise, the City Council did not consider the merits of InfinityLink's request.

94.     Before it voted to deny InfinityLink a cable franchise, the City Council did not discuss or consider the benefits a competitive cable operator would bring to the residents of Monticello.

95.     At no point during the August 10, 2020 meeting, nor in any communication with InfinityLink since that meeting, has the City provided any reason for voting to reject InfinityLink's request for a competitive cable franchise.

96.     Denying a competitive cable franchise for no reason is unreasonable.

97.     The only reason for the City's action that can be inferred from the discussion at the August 10, 2020 meeting is that the City did not want to allow InfinityLink to compete with the incumbent City-owned cable operator, CTS.

98.     Denying a competitive cable franchise to protect an incumbent cable operator is unreasonable.

99.     Denying a competitive cable franchise to protect the City's pecuniary interest in the incumbent cable operator is unreasonable and anticompetitive.

100.    Accordingly, the City's denial of InfinityLink's request for a competitive cable franchise is an unreasonable refusal to award a competitive franchise in violation of 47 U.S.C. § 541(a)(1).

## COUNT II

## VIOLATION OF THE TELECOMMUNICATIONS ACT

## (47 U.S.C. § 253)

101.    InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 100.

102.    47 U.S.C. §253(a) provides that "[n]o state or local statute or regulations, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

103.    47 U.S.C. § 253(c) identifies the scope of authority reserved for State and local governments to regulate telecommunications services, providing that "[n]othing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."

104.    InfinityLink seeks to construct a communications network in the City to provide voice, cable, and Internet service to residents and businesses in the City.

105.    InfinityLink first requested a competitive cable franchise to construct a cable system to enable it to provide those services.

106.    Without providing a reason, the City denied InfinityLink's request for a competitive cable franchise.

107.    InfinityLink then asked the City for authorization to access and use the public rights of way in the City to construct a communications network that would provide only non-cable communications services – specifically voice and Internet access service.

108.    The City again denied InfinityLink's request.  This time stating that it would not authorize such access unless and until InfinityLink obtained a cable franchise.

109.    Under Kentucky law, InfinityLink requires the approval of the City before it can construct its communications network in the City rights of way.  *See* Kentucky Const. §163.

110.    The City allows CTS, the incumbent cable operator, to access and use the public rights of way in the City to construct, operate and maintain its communications network to provide voice, cable, and Internet service to City residents and businesses.

111.    The City allows Windstream, the incumbent phone company serving the City, to access and use the public rights of way in the City to construct, operate, and maintain its communications network to provide voice and other services to City residents and businesses.

112.    InfinityLink's proposed services will compete with both CTS and Windstream.

113.    The City's refusal to award InfinityLink a cable franchise prohibits InfinityLink from utilizing its proposed cable system to provide telecommunications services to residences and businesses in the City in competition with CTS and Windstream.

114.     The City's refusal to allow InfinityLink to construct its communications network without a cable franchise prohibits InfinityLink from providing telecommunications services to residences and businesses in the City in competition with CTS and Windstream.

115.     The City's refusal to allow InfinityLink access to the public rights of way in the City to construct, operate and maintain a communications network when it allows other providers that same right of access is not "competitively neutral and nondiscriminatory" right of way management.

116.     Accordingly, the City's rejection of InfinityLink's requests, and failure to identify any path by which InfinityLink can construct its network, is an anticompetitive and discriminatory abuse of the City's authority to manage the public rights of way that effectively prohibits InfinityLink from providing telecommunications service in the City and therefore, violates and is preempted by 47 U.S.C. § 253(a) and (c).

117.     InfinityLink has been and continues to be irreparably harmed by the City's violation of 47 U.S.C. §253.

118.     Accordingly, an injunction is appropriate under the Supremacy Clause of the United States Constitution.  U.S. Const. Art. VI, Cl. 2; *see Metro. Gov't of Nashville & Davidson County v. XO Communs. Servs.*, 2009 U.S. Dist. LEXIS 143052, * 8-9 (M.D. Tenn. 2009) (citing *Indep. Living Ctr. V. Shewry*, 543 F.3d 1047 (9th Cir. 2008) (collecting cases)).

## COUNT III

## VIOLATION OF ANTI-TRUST LAWS

## (Sherman Act 15 U.S.C. § 1)

119.     InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 118.

120.    15 U.S.C. § 1 states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. §1.

121.    The City's denial of InfinityLink's request for a franchise, or other authorization, to construct a communications network in the rights of way in the City prevents InfinityLink from offering voice, cable, and Internet service to residents of Monticello.

122.    The voice, cable, and Internet service InfinityLink desires to provide are interstate in nature.

123.    CTS is the only incumbent cable operator authorized to use the City rights of way to provide cable and Internet service to residents of the City of Monticello.

124.    They City has a proprietary interest in CTS.

125.    The only basis for the City's denial was CTS's urging that approving InfinityLink's request would result in CTS being subject to competition and the City potentially losing revenue because of its ownership interest in CTS.

126.    In conspiring with CTS to deny InfinityLink authority to enter the market and provide competitive voice, cable, and Internet services, the City unlawfully and unreasonably abused its regulatory authority to protect its own interests as a commercial participant (as part owner of CTS).

127.    The City's denial is unreasonable under 47 U.S.C. § 541(a)(1).

128.    The City's denial was made to further its interests as a market participant in the market for cable and Internet service in the City.

129.    The result of the City and CTS's unlawful conspiracy has anticompetitive effects, including restraining competition in the market for cable and Internet service in the City, which

harms not only InfinityLink, but competition generally including any other competitor that might seek to challenge CTS in the City.

130.    Moreover, the City and CTS's unlawful acts harm the residents of the City of Monticello, by denying them the benefits of competition and an alternative provider in the market for cable and Internet services in the City.

131.    Accordingly, the City and CTS conspired to unreasonably restrain InfinityLink's ability to provide voice, cable, and Internet services in competition with CTS in violation of 15 U.S.C. § 1.

## COUNT IV

## VIOLATION OF ANTI-TRUST LAWS

### (Sherman Act 15 U.S.C. § 2)

132.    InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 131.

133.    Federal anti-trust law also makes illegal conspiracies to "monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.

134.    CTS is the only incumbent cable operator authorized to use the City rights of way to provide cable and Internet service to residents of the City of Monticello.

135.    Without competition from InfinityLink, CTS will continue to exercise monopoly power over the market for cable and Internet service within the city limits of the City of Monticello.

136.    Residents of the City have no alternative to CTS for wired cable and Internet service and there is no available substitute for such services in the City.

137.   To enter the market and provide cable and Internet service within the city limits of the City of Monticello in competition with CTS, InfinityLink requires authority from the City to construct its network in the City rights of way.

138.   The City and CTS conspired to deny InfinityLink authority to construct and operate its communications network in the City rights of way for the purpose of allowing CTS to continue to monopolize the market for cable and Internet service in the city limits of the City of Monticello.

139.   In conspiring with CTS to deny InfinityLink authority to enter the market and provide competitive services, the City unlawfully and unreasonably abused its regulatory authority to protect its own interests as a commercial participant (as part owner of CTS).

140.   The City's denial was made to further its interests as a market participant in the market for cable and Internet service in the City.

141.   The City and CTS's conspiracy to maintain CTS's monopoly power harms InfinityLink because it prevents InfinityLink from entering the market to provide service in the City of Monticello in competition with CTS.

142.   The City and CTS's conspiracy harms competition in the City generally because it allows CTS to maintain monopoly power in the market for cable and Internet service in the City, and leaves City residents without a choice of providers and without the benefits that flow from a competitive marketplace.

143.   Accordingly, the City and CTS have unlawfully monopolized and attempted to monopolize the market for cable and Internet service in the City, in violation of 15 U.S.C. § 2.

## COUNT V

## VIOLATION OF ANTI-TRUST LAWS

## (KENTUCKY REVISED STATUTES § 367.175(1))

144.    InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 143.

145.    The Kentucky Revised Statutes state that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful.

146.    The City's denial of InfinityLink's request for a franchise, or other authorization, to construct a communications network in the rights of way in the City prevents InfinityLink from offering voice, cable, and Internet service to residents of Monticello.

147.    The voice, cable, and Internet service InfinityLink desires to provide are interstate in nature.

148.    CTS is the only incumbent cable operator authorized to use the City rights of way to provide cable and Internet service to residents of the City of Monticello.

149.    They City has a proprietary interest in CTS.

150.    The only basis for the City's denial was CTS's urging that approving InfinityLink's request would result in CTS being subject to competition and the City potentially losing revenue because of its ownership interest in CTS.

151.    In conspiring with CTS to deny InfinityLink authority to enter the market and provide competitive voice, cable, and Internet services, the City unlawfully and unreasonably abused its regulatory authority to protect its own interests as a commercial participant (as part owner of CTS).

152.   The City's denial is unreasonable under 47 U.S.C. § 541(a)(1).

153.   The City's denial was made to further its interests as a market participant in the market for cable and Internet service in the City.

154.   The result of the City and CTS's unlawful conspiracy has anticompetitive effects, including restraining competition in the market for cable and Internet service in the City, which harms not only InfinityLink, but competition generally including any other competitor that might seek to challenge CTS in the City.

155.   Moreover, the City and CTS's unlawful acts harm the residents of the City of Monticello, by denying them the benefits of competition and an alternative provider in the market for cable and Internet services in the City.

156.   Accordingly, the City and CTS conspired to unreasonably restrain InfinityLink's ability to provide voice, cable, and Internet services in competition with CTS in violation of Kentucky Rev. Stat. § 367.175(1).

## COUNT VI

## VIOLATION OF ANTI-TRUST LAWS

## (KENTUCKY REVISED STATUTES § 367.175(2))

157.   InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 156.

158.   The Kentucky Revised Statutes state that "[i]t shall be unlawful for any person or persons to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth."  K.R.S. 367.175(2).

159.    CTS is the only incumbent cable operator authorized to use the City rights of way to provide cable and Internet service to residents of the City of Monticello.

160.    Without competition from InfinityLink, CTS will continue to exercise monopoly power over the market for cable and Internet service within the city limits of the City of Monticello.

161.    Residents of the City have no alternative to CTS for wired cable and Internet service and there is no available substitute for such services in the City.

162.    To enter the market and provide cable and Internet service within the city limits of the City of Monticello in competition with CTS, InfinityLink requires authority from the City to construct its network in the City rights of way.

163.    The City and CTS conspired to deny InfinityLink authority to construct and operate its communications network in the City rights of way for the purpose of allowing CTS to continue to monopolize the market for cable and Internet service in the city limits of the City of Monticello.

164.    In conspiring with CTS to deny InfinityLink authority to enter the market and provide competitive services, the City unlawfully and unreasonably abused its regulatory authority to protect its own interests as a commercial participant (as part owner of CTS).

165.    The City's denial was made to further its interests as a market participant in the market for cable and Internet service in the City.

166.    The City and CTS's conspiracy to maintain CTS's monopoly power harms InfinityLink because it prevents InfinityLink from entering the market to provide service in the City of Monticello in competition with CTS.

24

167.    The City and CTS's conspiracy harms competition in the City generally because it allows CTS to maintain monopoly power in the market for cable and Internet service in the City, and leaves City residents without a choice of providers and without the benefits that flow from a competitive marketplace.

168.    Accordingly, the City and CTS have unlawfully monopolized and attempted to monopolize the market for cable and Internet service in the City, in violation of Kentucky Rev. Stat. § 387.175(2).

## COUNT VII

## CONVERSION AND TRESPASS TO CHATTELS

## (AS TO CTS)

## (KENTUCKY COMMON LAW)

169.    InfinityLink incorporates herein by reference the allegations of paragraphs 1 through 168.

170.    InfinityLink owns, and therefore has legal title to, the Equipment.

171.    At all relevant times, InfinityLink had the right to possess the Equipment.

172.    On May 28, 2020, and on other occasions thereafter, InfinityLink has demanded that CTS return the Equipment to InfinityLink.

173.    To date, CTS has failed or refused to return the Equipment to InfinityLink.

174.    By keeping the Equipment, CTS has intermeddled with, and exercised dominion over, the Equipment for its own use and enjoyment.

175.    By keeping the Equipment, CTS intentionally and maliciously has deprived, and continues to deprive, InfinityLink of its ongoing right to use and enjoy the property.

176.    Due the foregoing acts by CTS, InfinityLink has suffered, and continues to suffer, damages from CTS's intermeddling and from InfinityLink's loss of the use and enjoyment of the Equipment.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants as follows:

(a) A declaration and judgment that the City's actions in rejecting InfinityLink's request for a competitive cable television franchise in the City was an unreasonable denial that violates and is preempted by 47 U.S.C. § 541(a)(1);

(b) A declaration and judgment that the City's action in rejecting InfinityLink's request for a competitive cable television franchise in the City, and the City's refusal to allow InfinityLink any other means of accessing the City's rights of way to provide non-cable telecommunications and Internet access services is an unreasonable and discriminatory exercise of the City's right of way management authority that amounts to an effective prohibition of service that violates and is preempted by 47 U.S.C. §253(a) and (c);

(c) A declaration and judgment that the City's and CTS's conspiracy by which the City rejected InfinityLink's request for a competitive cable television franchise in the City, and refused to allow InfinityLink any other means of accessing the City's rights of way to provide non-cable telecommunications and Internet access services is an unreasonable restraint of trade in violation of 15 U.S.C. § 1 and K.R.S. 367.175(1);

(d) A declaration and judgment that the City's and CTS's conspiracy by which the City rejected InfinityLink's request for a competitive cable television franchise in the City, and refused to allow InfinityLink any other means of accessing the City's rights of way to

provide non-cable telecommunications and Internet access services is an unlawful

attempt to allow CTS to monopolize the market for cable and Internet service in the City

of Monticello in violation of 15 U.S.C. § 2 and K.R.S. 367.175(2);

(e) An injunction requiring the City to grant InfinityLink a competitive cable franchise to

construct and operate a cable system in the City rights of way capable of providing voice,

cable, and Internet service, including telecommunications service;

(f) An order awarding InfinityLink damages pursuant to 15 U.S.C. § 15, in an amount to be

determined at trial for CTS's violation of 15 U.S.C. §§ 1 and 2 and K.R.S. 367.175(1)

and (2);

(g) An order directing CTS to deliver the Equipment to InfinityLink and awarding

InfinityLink damages in an amount necessary and sufficient to compensate InfinityLink

for CTS's acts of conversion and trespass to chattels;

(h) An order awarding InfinityLink its costs, reasonable attorneys' fees and other expenses

incurred in this action; and

(i) Such other relief as the Court deems just and proper.

DATED this 14th day of October 2020

Respectfully submitted,

s/ William L. Montague, Jr.
William L. Montague, Jr.
Montague Law PLLC
110 W. Vine St., Suite 300
Lexington, KY 40507
Tel. 859-423-1100
Fax 888-398-4958
will.montague@wmlex.com
*Counsel for Plaintiff InfinityLink*

*Pro Hac Vice* motion forthcoming:
Daniel P. Reing
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
701 Pennsylvania Ave. NW, Suite 900
Washington D.C. 20004
Tel. 202-434-7450
Fax 202-434-7400
DPReing@mintz.com